## Reorganization Committee of Farmers Bank & Trust Co. v. Title Ins. & Trust Co.

(Decided June 19, 1936.)

606

WOODWARD, DAWSON & HOBSON for appellant.

ELLIOTT LEE MADDOX for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

On June 6, 1928, Calvin W. McFerran, Jr., and wife jointly purchased a parcel of land containing about 16 acres in or about Anchorage, Jefferson county, Ky. Immediately and on the same day they executed a mortgage on the property to the Louisville Title Company to secure $4,500 borrowed from that institution, and for which they executed their bonds payable to it as trustee, or bearer. There was also recorded on that same day another mortgage given by the vendees' on the same property to Louise and Joseph Dinkelspiel to secure a debt of $1,352. On January 22, 1929, the purchasers of the property (the McFerrans) executed a third mortgage on it to the Farmers Bank & Trust Company of Anchorage, Ky., securing an indebtedness to it of $1,800. The husband later, by proper conveyances, vested his wife with the entire

title to the property, but, of course, subject to the mortgages that had been put upon it.

In October, 1929, Mrs. McFerran and her husband executed another mortgage on the property to the Louisville Title Company securing an indebtedness of $11,500 and also executed to it their series of bonds evidencing $11,000 of that amount payable to it as trustee or bearer, and in that mortgage the Dinklespiels and the Farmers Bank & Trust Company, by its cashier, one Hoagland, joined for the express purpose of subordinating their liens to the last acquired one by the Louisville Title Company for $11,000. The relinquishing clause by the bank through its cashier said that it "does hereby agree that the lien of the mortgage executed by the mortgagors to it, dated January 22, 1929, and recorded in deed book 1378, page 230, in said office, shall be inferior and subsequent to the lien of this mortgage, and as to said mortgage to it, this mortgage shall be first in priority." Hoagland, as cashier of the party of the fourth part to that instrument, signed the name of his bank by him and duly acknowledged it. Simultaneously, or practically so, with the execution of that mortgage, the first mortgage to the Louisville Title Company for $4,500, was released, thereby raising the strong presumption that the first $4,500 secured indebtedness to the Louisville Title Company composed a part of the last $11,000 indebtedness secured by the mortgage in the execution of which the bank so joined.

Later the Louisville Title Company failed and went into the hands of a receiver, and still later it was reorganized in the name of appellee and plaintiff below, Title Insurance & Trust Company, which, under the approval and accepted reorganization plan, became the owner of the debt. However, before the reorganization was effected, and while the affairs of the Louisville Title Company were in the hands of its receiver, McFerran and wife conveyed the property to the Title Realty Company with the consent of the receiver which the pleadings of the McFerrans, and the reorganization committee of the Farmers Bank & Trust Company, aver was but an incorporated agency of the Louisville Title Company organized and employed by it in the carrying on of its business. The deed ex-

ecuted to it expressly stated that it was "made subject to all valid and subsisting liens against the property hereby conveyed." That vendee subsequently conveyed the property to another corporation organized by the present plaintiff after it took charge of affairs as reorganized trustee, which was and is known as "Louisville Title Realty Corporation," and the defensive pleadings of both the McFerrans, and the reorganization committee aver that it was an agency of the present plaintiff in carrying out its purposes similar to those possessed by the former Title Realty Company that served the original Louisville Title Company before it became defunct. Chief among the purposes for which such subsidiary corporations were organized (if indeed they were such) was to take and hold title to encumbered property securing bonds where the makers thereof were defaulting in payments, and the trustee did not then desire to foreclose the liens for whatever reason it saw proper. In such cases the method was to procure a conveyance of the encumbered property, generally on condition that the personal obligation of the debtor would be canceled, but that the lien on the property would be kept alive and the secured creditor would look to it alone for the satisfaction of his debt.

On December 3, 1931, the Farmers Bank & Trust Company was taken charge of by the banking commission of Kentucky and one Allen Hieatt was appointed receiver, or deputy banking commissioner for it. Later a reorganization was effected in the name of appellants as its reorganization committee and Hieatt retired, but before doing so he transferred the McFerran debt to that committee. On June 1, 1934, this petition by plaintiff was filed in the Jefferson circuit court against the McFerrans, the Louisville Title Realty Corporation, and the Reorganization Committee, to recover judgment against the McFerrans for its debt and for a foreclosure of its lien as a prior one on the encumbered property. The McFerrans answered and pleaded the agreement to release them personally as a consideration for their conveying the property to the Title Realty Company as hereinbefore stated. The Reorganization Committee pleaded (1) the want of authority in Hoagland to subordinate its mortgage to

that of the last one executed in the Louisville Title Company (the involved litigated one), as was attempted to be done by him in joining in the execution of that instrument, and (2) that the conveyance of the property by the McFerrans to the Title Realty Company in consideration of their release from personal liability operated as an extinguishment of the debt against the McFerrans and a relinquishment of the lien on the property. Following pleadings made the issues and upon final submission, after evidence taken, the court declined to render a personal judgment against the McFerrans, but adjudged a prior lien to plaintiff against the mortgaged property with the Reorganization Committee holding a subordinate one and ordered the property sold and the proceeds applied as adjudged. To reverse that judgment the Reorganization Committee prosecutes this appeal.

Before disposing of either of the two defenses interposed by appellants, we deem it proper to notice another suggestion contained in brief of their counsel to the effect that there was no consideration for Hoagland's subordinating agreement; but the suggestion is wholly without merit for the two reasons: (a) There was no defense of "no consideration" interposed, but if there had been, then (b) the writing executed by Hoagland imports a consideration and the burden was on the one denying it to prove its absence, and there was no proof offered to establish the suggestion. See Higdon's Heirs v. Higdon's Devisees, 6 J. J. Marsh. 48; Bronston's Adm'r v. Lakes, 135 Ky. 173, 121 S. W. 1021, and Torian v. Caldwell, 178 Ky. 509, 199 S. W. 35. We will now return to a consideration of the two defenses supra, taking them up in the order named.

1. One of the most reliable authors on the subject of Banks and Banking is Mr. John T. Morse, Jr., and in the 1928 Edition (the 6th) of his treatise on that subject the text on page 407, sec. 152, volume I, says, upon the question as to the authority and power of bank cashiers: "In no other branch of banking law are the usages of business so frequently at variance with the rules of law, so powerful in warping and altering those rules, so diverse among themselves in different places and different institutions, and at dif-

ferent times. In no other branch of banking law is it so difficult to reconcile the decisions and opinions uttered from numerous independent judicial tribunals, or to educe from them generalizations, principles, and rules in any satisfactory shape." Following sections of the same chapter (XI), which begins on page 403, the question is gone into at great length, and in section 153 the author says: "There are certain functions which by long and universal usage have come to be recognized as belonging to the office of cashier, and have been judicially ascertained and declared to be inherent in the cashier as matter of law, and without any vote of the directors or provisions of the organic law. Such power may of course be enlarged or restricted by the charter, the bank, or the board; but in the absence of such special action these 'inherent' powers that are connoted by the title 'cashier' belong to him by virtue of his appointment to such office."

Then follows a series of sections devoted largely to a classification of subjects coming within his inherent authority and in which it is stated generally that the circumstances of time and location are not to be ignored, but taken into consideration in determining whether or not a particular transaction was or not within the authority of the cashier to perform. It is also pointed out that the authority possessed by a cashier of a bank is derivable through four sources: (A) that which inherently adheres to the office; (B) that which is specifically conferred by the bank through its board of directors for the performance of the particular transaction; (C) that which may be embraced by a general authorization made by the bank through its board of directors; and (D) that which arises from and is built up through a course of dealing out of which grows a custom conferring authority in the cashier to enter into the particular transaction under consideration.

In subdivision (b) of section 165, beginning on page 446 of the same volume the text—more particularly directed to the requisite proof by which the establishment or nonestablishment of the cashier's authority is reached—says: "But if the act which the cashier assumes to perform is one intrinsically perfectly proper to be committed to his charge, the law will presume in

favor of a third party dealing with him that he was duly authorized to perform it. The presumption is not conclusive, and may be rebutted. The third party simply makes out a prima facie case, which the bank may destroy by showing that neither a directorial resolution nor any usage had justified the cashier in his assumption of power.'' The cases cited in note 3 to that text completely support it, and it is, as we conclude, amply justified under present methods of conducting the business of banking.

We take judicial notice of prevailing conditions as affecting such long-established commercial institutions as banks. From that we know that cashiers of rural banks conduct practically all of the business of the one he serves, and that the president and directors of such rural banking institutions are mere figureheads with only occasional meetings, and only then, perhaps, at the suggestion of the cashier. Patrons of such institutions rarely know who is its nominal president, and perhaps never know who are its directors. More frequently than otherwise none of such officers possess either the experimentally or educationally acquired qualifications that are requisite for such officers in similar institutions located in thickly commercial centers, where they devote practically all or a large portion of their time performing their official duties, and who receive substantial salaries therefor; whilst the same class of officers in similar rural institutions receive no salary and refer entirely to the cashier the execution of duties which might exclusively appertain to those of similar officers in like city institutions. Such facts, judicially known by us, cannot be ignored in solving the issue, and especially so in view of the fact that Mr. Morse, and other standard text authorities, say, in effect, that a cashier of a bank (and especially one in rural localities) is largely, if not exclusively, the business officer and manager of his institution, even to a greater extent than the nominal president who for the time being holds that place. Instructive domestic cases in accord with the statements hereinbefore made, as taken from the text of Mr. Morse, are those of Hall-Watson Furniture Co. v. Cumberland Tel. & Tel. Co., 203 Ky. 90, 261 S. W. 883; First Nat. Bank v. Bryan, 215 Ky. 338, 285 S. W. 239; Paducah Newspapers, Inc., v. Goodman, 251 Ky. 754, 65 S. W. (2d) 990, and

others cited in those opinions. With the law in the condition as so generally stated, we will now briefly consider the limited amount of proof introduced at the hearing.

The appellant, Reorganization Committee for the defunct Farmers Bank & Trust Company, introduced as a witness in its behalf Mr. Charles Fust, who testified that during the year when Hoagland joined in the plaintiff's mortgage for the purpose indicated, he (witness) was a director of that bank and secretary of its board of directors. He read from the minutes that he made of the proceedings of the meetings of the board during that year and from which there appeared no expressly given authority for the cashier to execute the transaction in question; but he did not deny, nor in anywise negative the fact that such express authority had been conferred by some prior general provision made by the board of directors, nor do we construe his testimony as negativing the fact that Hoagland, as cashier, did not possess such authority, as derived from customary methods of transacting the bank's business. The transaction was "one intrinsically perfectly proper to be committed to his (Hoagland's) charge," and, under subdivision (b) of section 165, volume I of Morse on Banks and Banking, as inserted supra, the burden was on appellant to negative any such possibly acquired authority. At best, their testimony only negatived specific express authority. The witness did not pretend to state that no such authority was conferred upon Hoagland by the directors of the bank, nor was it shown that they did not acquiesce in its exercise after acquiring knowledge that it was done, but only that he had no record thereof, and if any officially conferred authority was given, it was at a meeting that he did not attend.

We do not think that we would be authorized to uphold this defense of the Reorganization Committee upon that character of testimony which was the extent of appellant's proof on that issue. The specific statement of the witness was: "Well, whatever is in that minute book is what transpired, what transpired outside of that I do not know." Charles A. Haeberle testified for plaintiff and stated that he was president of the defunct Louisville Title Company at and prior

to the time of the transactions here involved; that he was acquainted with cashier Hoagland, and that his institution had theretofore had other transactions with his company in which he represented his bank in matters and "things of this kind."

In addition to all of the foregoing, we are confronted with the undisputed fact that the subordinating by Hoagland of his bank's mortgage to the lien sought to be enforced herein was done in October, 1929, and not one word of objection or protest from the Farmers Bank & Trust Company, or any of its officers, was ever made or uttered against his authority to enter into that transaction until in October, 1934, when the Reorganization Committee filed its answer herein, during all of which time (5 years) the mortgage was of record, which furnished constructive notice of its contents. It would be a far-fetched and violent assumption to support a finding that actual knowledge was not brought home to the officers of the bank or to its successor, the Reorganization Committee, within that period. During such silence the Louisville Title Company failed and its later reorganization was, at least in part, made upon the hypothesis that the secured item of its total assets involved in this case was secured by the superior lien which Hoagland as cashier of the Farmers Bank & Trust Company had agreed to. Without determining whether such delay created sufficient laches to avoid the defense now under consideration, it still may be considered upon the issue of Hoagland's now contested authority to execute it for the bank for the purpose therein stated. We therefore conclude that this defense is without merit.

2. But little need be said in disposing of defense (2) supra, since the case of Purdom v. Broach, 210 Ky. 161, 275 S. W. 365, settles that question, according to our interpretation of it, adversely to appellant's contention. The facts of that case are on all fours with those in this one upon the question under consideration, provided the Title Realty Company, to which the conveyance of the property was made by the McFerrans, was the agent of the Louisville Title Company and took the conveyance to itself as such agent for its principal. In the Purdom Case the mortgaged property was, before foreclosure proceedings, deeded by the

mortgagor to the mortgagee and a second lienholder made the same contention therein as is now made by appellant in this case. We held that there was no extinguishment of the first mortgagee's lien by that sale transaction to it, although it might so result, unless provided against, in the absence of other liens.

That case is sought to be differentiated by appellant's counsel because of the fact (as contended) that the Title Realty Company in this case was a third party, distinct from the original mortgagee, and counsel for that reason seek to draw a distinction between the facts of the two cases and to thereby avoid application of the doctrine announced in the Purdom opinion. But we are not convinced by the argument advanced in support of that distinction, even if the assumption were true. However, as we have seen, appellants first averred in their defensive pleading that the Title Realty Company to which the conveyance was made was but a business agent of the mortgagee, Louisville Title Company, in the mortgage sued on; and the contention now made is the exact reverse of the contention made in their answer. Perhaps such a conveyance, either to the mortgagee or to a third party with its consent (although we do not see why it should be called upon to consent to such a conveyance) might have some merging or extinguishing effect where there was no intention manifested in the transaction that it should not do so. But here, as we have seen, the deed to the Title Realty Company expressly recognized that there were liens on the encumbered property and it was expressly stipulated therein that they should be preserved in the order of priority that they then occupied. Surely there exists no equitable principle whereby that solemn agreement should be disregarded. The court, therefore, properly, as we think, also overruled this defense.

Wherefore, for the reasons stated, the judgment is affirmed.

The whole court sitting.